**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 28, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DORIS RACHER, Co-Personal
Representative of the Estate of Eryetha
Mayberry, Deceased; SANDRA
CISPER, Co-Personal Representative
of the Estate of Eryetha Mayberry,
Deceased; EARLENE ADKISSON,
Co-Personal Representative of the
Estate of Eryetha Mayberry, Deceased,

      Plaintiffs - Appellees,

v.

WESTLAKE NURSING HOME
LIMITED PARTNERSHIP, d/b/a
Quail Creek Nursing and
Rehabilitation Center; WESTLAKE
MANAGEMENT COMPANY, a Texas
corporation,

      Defendants - Appellants,

and

RON LUSK, an individual,

      Defendant.

No. 16-6011

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:13-CV-00364-M)**

Jimmy K. Goodman (Harvey D. Ellis with him on the briefs), of Crowe & Dunlevy, Oklahoma City, Oklahoma, for Defendants-Appellants.

Kevin M. Coffey (Paul A. Harris with him on the brief), of Harris & Coffey, PLLC, Oklahoma City, Oklahoma, for Plaintiffs-Appellees.

---

Before **BRISCOE**, **EBEL** and **PHILLIPS**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Eryetha Mayberry was abused by two certified nursing assistants while in the care of Quail Creek Nursing Home, operated by Westlake Nursing Home Limited Partnership and Westlake Management Company (collectively "Quail Creek" or "Westlake"). Mrs. Mayberry's three daughters (collectively "plaintiffs") filed this diversity action against Westlake under Oklahoma law for negligence, negligence per se, and intentional infliction of emotional distress. After a trial, the jury found for plaintiffs and against Westlake on the claims of negligence and negligence per se, and made a special finding that Westlake had acted with reckless disregard for the rights of others. The jury awarded $1.2 million in compensatory damages and $10,000 in punitive damages. Westlake appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I**

Eryetha Mayberry lived on her own until she was 90. Aplt. App. vol. III, at 703. Sometime in 2008, Mrs. Mayberry's three daughters moved her into Quail

Creek Nursing Home.  See id. at 704, 719.  Mrs. Mayberry suffered from severe arthritis that made it very difficult for her to move and required her to use a wheelchair.  Id. at 704; Aplee. Supp. App. vol. I, at 5.  She also had difficulty communicating due to dementia.  Aplt. App. vol. III, at 705.

Caroline Kaseke began working at Quail Creek as a Certified Nursing Assistant (CNA) in March of 2007.  Aplee. Supp. App. vol. V, at 115.  Lucy Gakunga began working at Quail Creek in November of 2008, also as a CNA.  Aplee. Supp. App. vol. IV, at 55.  These two were Mrs. Mayberry's caretakers the entire time Mrs. Mayberry lived at Quail Creek.  Aplt. App. vol. IV, at 1047, Aplee. Br. at 6.  Both Gakunga and Kaseke had numerous write-ups in their personnel files for infractions including excessive tardiness, leaving in the middle of a shift, failure to show up for work, cell phone use, sleeping on the job, and refusal to complete assigned duties, including an incident in which five residents were left in wet diapers for over an hour while Gakunga chatted with coworkers in the hallway despite reprimand.  Aplt. App. vol. III, at 776–96; Aplee. Supp. App. vol. II, at 7–15.  The personnel files also indicate that Kaseke was clocking out before the required rounds at the end of her shift, that she had been recommended for termination in September of 2007, and that she had been reprimanded again in June of 2008 for sleeping on the job, which was "grounds for immediate termination," but was not terminated.  Aplee. Supp. App. vol. III, at 16–18.  Despite this record, Kaseke was responsible for training new CNAs on

3

the proper treatment of residents at Quail Creek. Aplt. App. vol. IV, at 890.

Doris Racher, one of Mrs. Mayberry's daughters, testified at trial that the family began to notice bruising on her mother's hands and arms soon after Mrs. Mayberry moved into Quail Creek. Aplt. App. vol. III, at 706–07. Mrs. Racher further testified that Quail Creek was unable to explain the bruising and did not seem properly concerned by the family's repeated complaints. Id. at 705–07. In approximately February of 2012, Mrs. Mayberry began crying out for help and telling family members that someone was hurting her mouth. Aplee. Supp. App. vol. I, at 5. Mrs. Racher also testified that her mother began refusing to take showers even though "she was always really fanatic about cleanliness." Aplt. App. vol. III, at 709.

Sometime in 2011, Mrs. Mayberry's family began noticing items missing from her room so they placed a hidden, motion-activated video camera facing Mrs. Mayberry's bed. Id. at 710; Aplee. Supp. App. vol. I, at 5. The camera initially was not recording properly, but Mrs. Racher replaced the SIM card and the family was eventually able to view some videos recorded by the camera. Aplt. App. vol. III, at 710–12. The camera may have started recording correctly around December of 2011. Aplee. Supp. App. vol. I, at 5.

Five video clips from the camera were played for the jury. Aplt. App. vol. III, at 715. Although the time line is disputed, these clips were likely recorded between February and early April of 2012. See id. at 720–24. These clips

4

showed two nursing home employees, later identified as Gakunga and Kaseke, interacting with Mrs. Mayberry. Aplee. Supp. App. vol. I, at 5. The videos have no audio, but show Gakunga slapping Mrs. Mayberry in the face with latex gloves, wadding up the gloves, stuffing them in Mrs. Mayberry's mouth, and forcibly holding them there as Mrs. Mayberry attempts to push Gakunga's hand away. Id. Kaseke is seen in the videos watching this take place. Id. The videos then show Gakunga and Kaseke roughly lifting Mrs. Mayberry from her wheelchair into bed and Gakunga pushing on Mrs. Mayberry's face in what appears to be an attempt to make her lie down. Id. at 5–6. One clip shows Gakunga pointing her finger at Mrs. Mayberry and apparently scolding her or perhaps threatening her. Aplt. App. vol. III, at 751–52. Finally, the video clips show Gakunga "performing some sort of compressions with both hands to [Mrs. Mayberry's] torso." Aplee. Supp. App. vol. I, at 6. Plaintiffs assert that this action was intended to force Mrs. Mayberry to empty her bladder so the caretakers would not have to change her diaper as often. Aplee. Br. at 3. Quail Creek and the caretakers denied any knowledge of this practice, but acknowledged that there was no medical justification for the action. Aplt. App. vol. III, at 745–56; Aplt. App. vol. IV, at 991–92.

On April 16, 2012, Mrs. Mayberry's family brought the video to the attention of Quail Creek Nursing Home. Aplee. Supp. App. vol. I, at 6. Quail Creek responded by calling the police and isolating Gakunga and Kaseke in

5

separate rooms, where they were monitored to ensure they could not further endanger the home's residents. Id.; Aplt. App. vol. IV, at 882. Gakunga and Kaseke were arrested and charged with caretaker abuse pursuant to Okla. Stat. tit. 21, § 843.1. Aplee. Supp. App. vol. I, at 4. Gakunga pled guilty, served her sentence, and was then deported. Aplt. App. vol. II, at 272. Kaseke disappeared while out on bail and her whereabouts are currently unknown. Id.

All three daughters testified that Mrs. Mayberry became withdrawn during her stay at Quail Creek and they alleged that the abuse caused Mrs. Mayberry's physical condition to decline. Aplee. Supp. App. vol. I, at 4; Aplt. App. vol. III, at 717; Aplt. App. vol. IV, at 1052–54, 1042–43. Mrs. Mayberry died in July of 2012, just three months after the abuse was discovered. Aplt. App. vol. III, at 717.

In addition to the video evidence, plaintiffs presented evidence at trial of two other incidents, both taking place on April 4, 2012. First, Ariel Pierce, a nursing student, testified that, on April 4, 2012, she witnessed Gakunga strike Mrs. Mayberry on the forehead and then put Mrs. Mayberry in a cold shower. Aplt. App. vol. IV, at 842–43, 848. Pierce reported this incident to Quail Creek. Id. at 843. Second, another nursing student, Christina Gilbert, testified that she witnessed Kaseke spray an unnamed resident in the face with cold water so violently that the resident's dentures fell out onto the shower floor. Id. at 851–52. This incident also took place on April 4, 2012, and Gilbert reported it to

6

Quail Creek that day.  Id. at 852.

At trial, Quail Creek Executive Director Ginger Barsotti and Director of Nursing Susan Easterling testified that the conduct on the video was abuse and "utterly intolerable."  Aplt. App. vol. III, at 737–38; Aplt. App. vol. IV, at 1028–29.  Easterling also testified that the intentional acts of Gakunga and Kaseke caused emotional distress to Mrs. Mayberry.  Id. at 1029.  In addition to these admissions that the abuse occurred and was perpetrated by Quail Creek employees, there was ample evidence that Quail Creek was directly negligent in failing to investigate and report incidents of abuse.  Quail Creek Administrator Amanda Penrod testified that she could not locate any record of an investigation relating to either of the April 4, 2012 incidents reported by the nursing students and further admitted that the Oklahoma State Department of Health had no record of the incidents being reported as required by Oklahoma law.  Id. at 864–65.  She testified that, at the time, she did not know these incidents were reported and so had no personal knowledge of any investigation, but stated that an investigation would have been completed by Easterling.  Id. at 865.  Easterling then testified that she did not know why no record of the investigation could be located and she could not recall any details of the investigation, though she insisted that she had completed one because she claimed that she or Penrod "investigated all allegations" and took them "very seriously."  Id. at 1019–28.  Easterling could not explain why Quail Creek was unable to locate a Care Plan for Mrs. Mayberry

7

even though such a plan is required by law.  Id. at 1001–03.  Further, she could not explain why no effort was made to find out why Mrs. Mayberry began calling out for help.  Id. at 1011–16.  Easterling also struggled to find information in Mrs. Mayberry's chart, was unable to explain the organization of the chart or where certain types of care information would be recorded, and could not identify the nurse aides in the video even though she was the director of nursing at the time and these employees had worked at Quail Creek for several years.  See id. at 1001–16.

Gakunga testified (by deposition read at trial) that she had not done anything wrong and that she treated Mrs. Mayberry the same every day.  Id. at 960–62.  She refused to watch the video of the abuse and so was unable to comment on her actions in it.  Id. at 960.  When asked whether she treated Mrs. Mayberry any differently either before or during the incident, Gakunga responded:  "Before that incident, no.  During that, there is a video, so that means I did it.  I don't remember exactly when or what shift or what the time was."  Id.  Similarly, when asked if she had ever done anything improper, she stated:

> I mean I worked everyday, I would say everyday, and have never ever done something wrong.  If I did it, maybe I wasn't even thinking about it.  Like as the slapping of the gloves, that's wrong, and I know it is wrong, and the video shows it, so I am wrong. I did it and I'm wrong. But, as I said, it is about remembering the exact time, so it is wrong at the end of the day.

Id. at 975.

8

Gakunga was unable to describe Mrs. Mayberry's physical condition or the proper way to care for her. See id. at 965–66. She also was unable to describe any of her actions that would constitute abuse of Mrs. Mayberry other than repeating what had been told to her by her criminal defense counsel. See id. at 960–64. When asked what Quail Creek had taught her about abuse, Gakunga responded "I don't know." Id. at 970. When asked to describe an act she would consider abusive, her response was "[t]he fact that the glove and the—I don't know what to call that." Id. The defense attorney asked if she meant "[u]sing your hands up and down on the face?" and she responded "[o]n the side that I was, yes." Id.

The jury was instructed as to negligence, negligence per se, and intentional infliction of emotional distress, including an instruction on vicarious liability. Aplt. App. vol. II, at 457–64. The jury was further instructed as to the possibility of punitive damages if the defendant acted with reckless disregard for the rights of others. Id. at 467. At the conclusion of the evidence in the first phase of the trial, the jury was sent to deliberate on the issues of liability, reckless disregard, and the amount of compensatory damages. The jury found that Westlake was liable on theories of negligence and negligence per se, that Westlake acted with reckless disregard for the rights of others, and that plaintiffs were entitled to compensatory damages in the sum of $1.2 million. Id. at 475–76. Following that verdict, counsel was given the opportunity to present their arguments as to

9

punitive damages and the jury received an additional instruction. After a second opportunity to deliberate, the jury returned a verdict for punitive damages in the amount of $10,000. Id. at 477. Following the jury verdict, Westlake moved to alter or amend the judgment and moved for remittitur or alternatively a new trial, both pursuant to Federal Rule of Civil Procedure 59. The district court denied both motions.

## II

Westlake now appeals and raises four issues: (1) whether the district court erred by failing to reduce compensatory damages to the statutory cap of $350,000; (2) whether the district court erred by failing to reduce the allegedly excessive compensatory damage award of $1.2 million or, in the alternative, to grant a new trial; (3) whether the district court erred by allowing allegedly improper closing argument regarding punitive damages during the first phase of the trial; and (4) whether the district court erred by admitting evidence of an unrelated incident subject to a limiting instruction.

We review the district court's decisions on each of these issues for abuse of discretion. Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 434–35 (1996) (motion to alter or amend a judgment); Hill v. J.B. Hunt Transp., Inc., 815 F.3d 651, 668 (10th Cir. 2016) (same); Whittenburg v. Werner Enters. Inc., 561 F.3d 1122, 1127 (10th Cir. 2009) (motion for a new trial based on an allegedly prejudicial closing argument); Sanjuan v. IBP, Inc., 160 F.3d 1291, 1296 (10th

10

Cir. 1998) (motion for a new trial based on the allegedly erroneous admission of evidence).

To obtain a reversal for the allegedly erroneous admission of evidence or closing argument, an appellant also must make a showing of prejudice. Even if an argument was "improper, a judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict." Lambert v. Midwest City Mem'l Hosp. Auth., 671 F.2d 372, 375 (10th Cir. 1982). Similarly, the court may set aside a jury verdict due to erroneously admitted evidence only if it reasonably concludes that a trial without that evidence would have had a contrary result. Sanjuan, 160 F.3d at 1296.

### *Statutory Damage Cap*

In a civil action arising from a claimed bodily injury, Oklahoma law caps noneconomic damages at $350,000 unless special findings are made. See Okla. Stat. tit 23, § 61.2. After the jury awarded $1.2 million in noneconomic compensatory damages to the plaintiffs, Westlake moved to alter or amend the judgment, arguing that the award should be reduced to $350,000 because the required procedures for lifting the cap had not been followed. Aplt. App. vol. II, at 480. The district court denied Westlake's motion, concluding that the requirements for lifting the cap were satisfied in this case. Aplt. App. vol. III, at 663. As a matter of Oklahoma law, the precise parameters of the findings and procedures this statute would require in this case are not immediately clear.

11

Further, it is not clear that any such procedures would be binding on federal courts under the doctrine of Erie R.R. v. Tompkins, 304 U.S. 64 (1938). We decline to address these questions, however, because the damage cap is an affirmative defense that Westlake waived by failing to assert it. We therefore affirm the district court on other grounds.[1]

Neither party mentioned Oklahoma's statutory limitation on noneconomic damages at any point before the jury rendered its verdict. Westlake first raised the issue in its motion to alter or amend the judgment, filed twenty-eight days after judgment was entered in the case and more than a month after the trial concluded. Each party now argues that the other waived its rights by failing to raise the statute in a timely manner. Specifically, Westlake argues that, as a matter of Oklahoma substantive law, the statutory cap is "mandatory" and plaintiffs "have not secured the right to exceed the cap on noneconomic damages" because they failed to invoke the statute and satisfy its requirements. Aplt. Br. at 15–16. In contrast, plaintiffs argue that, as a matter of federal procedural law, the damage cap provides an affirmative defense that Westlake waived by not timely asserting it. Aplee. Br. at 26–29. Because we agree with plaintiffs that the cap is an affirmative defense that Westlake waived, this conclusion is dispositive of the

---

[1] We may affirm the district court's decision for any reason supported by the record. Jones v. UPS, 674 F.3d 1187, 1206 n.7 (10th Cir. 2012) (quoting United States v. Flower, 29 F.3d 530, 536 n.9 (10th Cir. 1994)) ("We may uphold the district court's decision . . . under any ground that the record supports.").

12

statutory cap issue.

It is undisputed that a state's statutory limit on damages is substantive law that federal courts sitting in diversity must apply. See Gasperini, 518 U.S. at 428. The question before us now is whether the classification of that substantive right as either an affirmative defense that defendants must assert, or a pleading requirement plaintiffs must satisfy, is also a matter of substantive state law. We have not previously addressed this question. See Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs, 41 F.3d 600, 604 (10th Cir. 1994) (concluding that a damage cap in the Oklahoma Governmental Tort Claims Act, Okla. Stat. tit 51, § 154(A)(2), operated as an affirmative defense, but not specifying what law governed the dispute). The other circuits to confront this issue have, without analysis as to the applicable law, reached conflicting results. Compare Jakobson v. Mass. Port Auth., 520 F.2d 810, 813 (1st Cir. 1975) (holding that a state damage cap was an affirmative defense under Rule 8), and Simon v. United States, 891 F.2d 1154, 1157 (5th Cir. 1990) (same), with Taylor v. United States, 821 F.2d 1428, 1432–33 (9th Cir. 1987), cert denied, 485 U.S. 992 (1988) (looking to substantive state law and concluding that a state statute's damage cap was a "limitation of damages" rather than an affirmative defense); see also Taylor v. United States, 485 U.S. 992, 992–93 (1988) (White, J., dissenting) (acknowledging conflict and arguing that certiorari should be granted to resolve the dispute); Carter v. United States, 333 F.3d 791, 796 (7th Cir. 2003)

(acknowledging conflict but declining to decide the issue). We believe the Supreme Court's subsequent decision in Shady Grove Orthopedic Associates., P.A. v. Allstate Insurance Co., 559 U.S. 393 (2010), informs the proper analysis of this question and we now hold that state substantive law governs the dispute.

In diversity cases, the Erie doctrine instructs that federal courts must apply state substantive law and federal procedural law. Gasperini, 518 U.S. at 427; James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1216–17 (10th Cir. 2011). If a federal rule of civil procedure answers the question in dispute, that rule governs our decision so long as it does not "exceed[] statutory authorization or Congress's rulemaking power." Shady Grove, 559 U.S. at 398; Hanna v. Plumer, 380 U.S. 460, 471 (1965). When faced with a choice between a state law and an allegedly conflicting federal rule, we follow the framework described by the Supreme Court in Shady Grove, as laid out by Justice Stevens in his concurring opinion. James River, 658 F.3d at 1217 (citing Garman v. Campbell Cnty. Sch. Dist. No. 1, 630 F.3d 977, 983 n.6 (10th Cir. 2010)). First, the court must decide "whether the scope of the federal rule is '"sufficiently broad"' to '"control the issue"' before the court, 'thereby leaving no room for the operation' of seemingly conflicting state law." Shady Grove, 559 U.S. at 421 (Stevens, J., concurring) (quoting Burlington N. R.R. v. Woods, 480 U.S. 1, 4–5 (1987)); James River, 658 F.3d at 1218. When conducting this analysis, the Federal Rules

should be given their plain meaning.[2]  Walker v. Armco Steel Corp., 446 U.S. 740, 750 n.9 (1980).  There is a conflict only if there is a "direct collision" between federal and state law — one that is "unavoidable."  Id. at 749–50 (first quoting Hanna, 380 U.S. at 472; then quoting id. at 470).  If the state and federal rules "can exist side by side, . . . each controlling its own intended sphere of coverage," there is no conflict.  Id. at 752; Scottsdale Ins. Co. v. Tolliver, 636 F.3d 1273, 1277 (10th Cir. 2011).  If there is a direct collision between the state law and the federal rule, the court must next determine whether the federal rule is valid.  Shady Grove, 559 U.S. at 422; James River, 658 F.3d at 1218.  If it is, that rule governs the dispute and there is no need to "wade into Erie's murky waters."  Shady Grove, 559 U.S. at 398 (majority opinion).  If there is no direct collision, however, there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie.  See Walker, 446 U.S. at 749–50, 752–53, 752 n.14.  Here we conclude, first under Shady Grove, that there is no conflict between the Oklahoma statute and the Federal Rules, and second,

---

[2]  The Court has also cautioned, however, that it has "avoided immoderate interpretations of the Federal Rules that would trench on state prerogatives without serving any countervailing federal interest," Shady Grove, 559 U.S. at 439 (Ginsburg, J., dissenting), and that "in deciding whether a federal . . . Rule of Procedure encompasses a particular issue, a broad reading that would create significant disuniformity between state and federal courts should be avoided if the text permits," Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 37–38 (1988) (Scalia, J., dissenting).  See also Gasperini, 518 U.S. 415, 427 n.7 ("Federal courts have interpreted the Federal Rules . . . with sensitivity to important state interests and regulatory policies.").

under Erie, that whether a statute provides an affirmative defense or a pleading requirement is a question of substantive state law.

Because the parties allege the Oklahoma statute conflicts with the federal rules, we begin our analysis under Shady Grove, and our first inquiry is whether a federal rule of civil procedure directly conflicts with the state statute. Under federal law, the Supreme Court has looked to Federal Rule 8 to determine whether a statute creates an affirmative defense or a pleading requirement. See Jones v. Bock, 549 U.S. 199, 212 (2007) (noting that, under Federal Rule 8, the exhaustion requirement in the Prison Litigation Reform Act, 42 U.S.C. § 1997e et seq., would ordinarily be viewed as an affirmative defense rather than a pleading requirement). Federal Rule 8(c)(1) provides that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." The rule then goes on to list a number of such avoidances or affirmative defenses, but it does not expressly include limitations on damages in that list. Nonetheless, Rule 8(c)'s list is not exhaustive. See Jones, 549 U.S. at 212 ("Rule 8(c) identifies a nonexhaustive list of affirmative defenses that must be pleaded in response."). The majority of federal circuits to address the question have held that a damages cap must be pled as an affirmative defense in federal court. We agree and, therefore, conclude that Oklahoma's cap on noneconomic compensatory damages awarded on a claim for bodily injury is sufficiently like the avoidances and affirmative defenses listed in Rule 8(c) to fall within that rule's pleading

16

requirement. Federal Rule 8(c), therefore, required Westlake, in this federal diversity action, to plead Oklahoma's damages cap as an affirmative defense.

Where then, as here, a federal procedural rule governs the question at issue, that rule controls—"notwithstanding" state law—so long as the federal rule is a valid exercise of authority given to the Supreme Court to enact federal rules of civil procedure pursuant to the Rules Enabling Act, 28 U.S.C. § 2072. See Shady Grove, 559 U.S. at 406-07; Hanna v. Plumer, 380 U.S. 460, 463-64 (1965); see also James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1217 (10th Cir. 2011). Congress, through the Rules Enabling Act, authorized the Supreme Court to adopt rules of "procedure"; that is, rules governing "the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them," Hanna, 380 U.S. at 464 (internal quotation marks omitted).

However, Congress expressly provided in the Enabling Act that procedural rules adopted by the Supreme Court must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b); see also Shady Grove, 559 U.S. at 407. Justice Stevens, in his controlling concurrence in Shady Grove, addressed how, in a diversity case where state substantive law applies, to analyze whether a federal rule of procedure abridges, enlarges or modifies a substantive right. Id. at 418-21 (Stevens, J., concurring); see Gasperini, 518 U.S. at 427. Justice Stevens advised courts not to rely on "whether the state law at issue takes the form of what is

17

traditionally described as substantive or procedural." Shady Grove, 559 U.S. at 419 (Stevens, J., concurring). Rather, a more nuanced approach is required. Id. at 419-20. Justice Stevens observed that "[a] state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." Id. (citation and internal quotation marks omitted). One example of such a law is a procedural rule that "may . . . define the amount of recovery." Id. at 420. Ultimately, a court must consider whether the federal procedural rule has displaced "a State's definition of its own rights or remedies." Id. 418. If so, the federal rule may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies a state substantive right.

With Justice Stevens's admonitions in mind, we turn to the Oklahoma statute at issue in this case and, as discussed in greater detail below, conclude that Fed. R. Civ. P. 8(c) does not abridge, enlarge or modify any substantive right under Oklahoma law. Federal courts sitting in diversity must apply state substantive law in order to discourage forum shopping and to avoid inequitable administration of the respective state and federal laws. Gasperini, 518 U.S. at 428; Hanna, 380 U.S. at 468; Scottsdale Ins., 636 F.3d at 1277. To decide whether a state law is substantive and therefore applicable in federal courts, courts must decide whether applying the law will significantly affect the outcome

18

of the litigation. Gasperini, 518 U.S. at 427–28. If a state law "concerns merely the manner and the means" by which substantive rights are enforced, it is procedural, but if its application would "significantly affect the result of a litigation," it is substantive. Guaranty Trust Co. v. York, 326 U.S. 99, 109 (1945). In practice, a state law is substantive when it "bears on a State-created right vitally and not merely formally or negligibly," or when it "intimately affect[s] recovery or non-recovery." Id. at 110.

Further, when state law creates a cause of action, it also defines the scope of that cause of action. Ragan v. Merchs. Transfer & Warehouse Co., 337 U.S. 530, 533 (1949). This includes the applicable burdens, defenses, and limitations.[3] Id. Failing to enforce such attendant attributes of a state law would lead to different measures of the substantive rights enforced in state and federal courts, contrary to Erie's command. See id. at 533. "[T]he result would be an 'inequitable administration' of the law." Walker, 446 U.S. at 753 (quoting Hanna, 380 U.S. at 468).

In this case, the Oklahoma statute creates a substantive right to limit damages in certain cases alleging bodily injury. Because that right is created by state law, state law also governs the measure of that right and the burden that

---

[3] For example, the Supreme Court has twice held that "state service requirements which are an integral part of the state statute of limitations" are substantive requirements that federal courts must apply in diversity cases. Walker, 446 U.S. at 752; see Ragan, 337 U.S. at 532–34.

19

must be satisfied to assert it. Whether the statute operates as an affirmative defense, granting defendants a substantive right to claim its protection, or whether it creates a heightened pleading requirement for plaintiffs, thereby increasing their burden for stating a substantive claim over the specified amount, is an integral part of the substantive right created by the statute. Thus, this is a question of substantive state law. To hold otherwise could result in the inequitable administration of the law in state and federal courts.

We thus turn to Oklahoma substantive law. Oklahoma courts have not yet had the opportunity to directly address whether Okla. Stat. tit. 23, § 61.2 creates a pleading requirement or an affirmative defense, so we must predict how the Oklahoma Supreme Court would decide the issue. See TMJ Implants, Inc. v. Aetna, Inc., 498 F.3d 1175, 1180 (10th Cir. 2007). When interpreting a statute, the Oklahoma Supreme Court's "goal is to determine the Oklahoma Legislature's intent." Am. Biomedical Grp., Inc. v. Techtrol, Inc., 2016 OK 55, ¶ 22, 374 P.3d 820, 827 (Okla. 2016). "The law-making body is presumed to have expressed its intent in the statute's language and to have intended what the text expresses." State v. One 1965 Red Chevrolet Pickup, 2001 OK 82, ¶ 5 n.19, 37 P.3d 815, 818 n.19 (Okla. 2001). Resort to rules of statutory construction is only appropriate when "the intent cannot be ascertained from a statute's text." Id.

We therefore begin with the text of the statute. In all civil actions arising from a claimed bodily injury, Oklahoma law limits noneconomic compensatory

20

damages to $350,000.[4]  Okla. Stat. tit. 23, § 61.2(B).  This limit does not apply if the defendant acted "[i]n reckless disregard for the rights of others."[5]  Id. § 61.2(C)(1).  The statute also provides a series of procedures that a court is instructed to follow in all civil actions arising from a claimed bodily injury.  See id. § 61.2(D)–(F).  At no point does the statute expressly purport to create either an affirmative defense or a heightened pleading standard.  The legislature's intent regarding which party bears the burden of raising this statute is not clear from the text, so we must look to canons of construction.

Oklahoma follows the canon that "a statute should not be construed any more broadly or given any greater effect than its terms require."  Edmondson v. Pearce, 2004 OK 23, ¶ 79 n.48, 91 P.3d 605, 640 n.48 (Okla. 2004) (quoting Huffman v. Okla. Coca-Cola Bottling Co., 1995 OK 76, ¶ 18, 281 P.2d 436, 440

---

[4]  Okla. Stat. tit. 23, § 61.2(B) provides:
    Except as provided in subsection C of this section, in any civil action arising from a claimed bodily injury, the amount of compensation which a trier of fact may award a plaintiff for noneconomic loss shall not exceed Three Hundred Fifty Thousand Dollars ($350,000.00), regardless of the number of parties against whom the action is brought or the number of actions brought.

[5]  Okla. Stat. tit. 23, § 61.2(C) provides:
    Notwithstanding subsection B of this section, there shall be no limit on the amount of noneconomic damages which the trier of fact may award the plaintiff in a civil action arising from a claimed bodily injury resulting from negligence if the judge and jury finds, by clear and convincing evidence, that the defendant's acts or failures to act were: (1) In reckless disregard for the rights of others; (2) Grossly negligent; (3) Fraudulent; or (4) Intentional or with malice.

(Okla. 1955)). It follows that, absent express legislative intent to the contrary, the Oklahoma Supreme Court would interpret this statute to follow the ordinary practice regarding whether a statute provides an affirmative defense or creates a pleading requirement. The ordinary practice would be governed by the Oklahoma Pleading Code.

Section 2008 of the Oklahoma Pleading Code is derived from and closely tracks the requirements of Federal Rule of Civil Procedure 8. See Okla. Stat. tit. 12, § 2008; Fed. R. Civ. P. 8; Gunn v. Consol. Rural Water & Sewer Dist. No. 1, 1992 OK 131, ¶ 13, 839 P.2d 1345, 1351 (Okla. 1992) (recognizing "Rule 8(a) of the Federal Rules of Civil Procedure" as "the progenitor of [Oklahoma's] pleading code."). The Oklahoma Supreme Court "has routinely relied upon federal case law to assist with interpretation of the corresponding sections of the Oklahoma Pleading Code," Cornett v. Carr, 2013 OK 30, ¶ 9, 302 P.3d 769, 772 (Okla. 2013), including Rule 8, Fanning v. Brown, 2004 OK 7, ¶ 20, n.9, 85 P.3d 841, 847 n.9 (Okla. 2004). Like Federal Rule 8, "[s]ection 2008 of the Pleading Code merely requires that the pleading shall contain '[a] short and plain statement of the claim showing that the pleader is entitled to relief.'" Gens v. Casady Sch., 2008 OK 5, ¶ 9, 177 P.3d 565, 569 (Okla. 2008) (quoting Okla. Stat. tit. 12, § 2008(A)(1)). Plaintiffs need not "correctly identify a theory of recovery or describe the remedy affordable for an asserted right's vindication." Id. Nothing in Oklahoma statutory or case law indicates a willingness to impose heightened

22

pleading requirements beyond the basic premise that the allegations in a complaint must "plausibly demonstrate" that the plaintiff can prove the elements of a claim against the defendant. See Jordan v. W. Farmers Elec. Coop., 2012 OK 94, ¶ 11, 290 P.3d 9, 12 (Okla. 2012) ("To determine whether Jordan's complaint sufficiently alleged facts, this Court must determine whether the allegations, when taken as true and all reasonable inferences drawn from them, 'plausibly demonstrate' that Western acted with knowledge that Jordan's injury was substantially certain to follow." (quoting Parret v. UNICCO Serv. Co., 2005 OK 54, ¶ 26, 127 P.3d 572, 579 (Okla. 2005))). Therefore, we conclude the Oklahoma Supreme Court would interpret Okla. Stat. tit. 12, § 2008, like its federal counterpart, to require only the listed elements unless the legislature expressly provides otherwise. Thus, we conclude that Okla. Stat. tit. 23, § 61.2(B) operates as an affirmative defense, placing the burden on defendants to assert it.

This conclusion is bolstered by three Oklahoma Supreme Court cases. First, the Oklahoma Supreme Court referred to a statutory privilege exemption, found in Okla. Stat. tit. 12, § 1443.1, as an affirmative defense that a defendant must assert and prove. Gaylord Entm't Co. v. Thompson, 1998 OK 30, ¶ 29, 958 P.2d 128, 145 (Okla. 1998). Second, in the context of a claim involving tortious interference with contractual relations, the Oklahoma Supreme Court referred to privilege under common law as a liability-defeating defense that defendants must

23

assert. <u>McNickle v. Phillips Petroleum Co.</u>, 2000 OK 28, ¶ 12, ¶ 12 nn.26–27 (Okla. 2000). Third, the Oklahoma Supreme Court, albeit only one justice in a concurring opinion, cited, with approval, our previous holding that a damage cap in a similar Oklahoma statute, Okla. Stat. tit. 51, §§ 151–171, operated as an affirmative defense that defendants must raise. <u>See</u> <u>Hathaway v. Med. Research & Tech. Auth.</u>, 2002 OK 53, ¶¶ 13–15, 49 P.3d 740, 751–52 (Okla. 2002) (Kauger, J., concurring in part and dissenting in part) (citing <u>Bentley</u>, 41 F.3d at 604–05).

Westlake's argument that the language of the Oklahoma statute is "mandatory" is unavailing under Oklahoma law. Although the statute provides that the amount of compensation awarded "shall not exceed" the statutory limit, it also provides that "there shall be no limit" on the compensation awarded in a number of enumerated circumstances. <u>See</u> Okla. Stat. tit. 23, § 61.2(B)–(C). These provisions are equally mandatory, so the plain text does not indicate which party must assert its rights under the statute. Further, the privilege exemption that the Oklahoma Supreme Court found to be an affirmative defense is provided for in a statute that states "[n]o publication which under this section would be privileged shall be punishable as libel." Okla. Stat. tit. 12, § 1443.1(B); <u>see also</u> <u>Gaylord Entm't Co.</u>, 1998 OK 30, ¶ 29, 958 P.2d at 145. This language is also "mandatory" but did not preclude the Oklahoma Supreme Court's assessment that

24

it created an affirmative defense defendants must assert, not a pleading requirement plaintiffs must satisfy.  See id.

Because Okla. Stat. tit. 23, § 61.2(B) operates as an affirmative defense, there is no conflict between it and the requirements of Fed. R. Civ. P. 8(c).  Cf. James River, 658 F.3d at 1218-19 (applying Shady Grove's analysis and concluding that, where there was no conflict between federal rule of evidence and state law, there was no need to consider validity of federal rule).  Rather, both Oklahoma law and Fed. R. Civ. P. 8(c) required Westlake to plead the damages cap as an affirmative defense.  Further, that requirement did not itself displace the damages cap or the statutory requirements for lifting the damages cap.

Finally, it is well established that failure to assert an affirmative defense results in waiver of that defense.  Bentley, 41 F.3d at 604.  Here, Westlake failed to raise the statutory damage cap in a responsive pleading, or at any point before the trial was completed.  Thus, Westlake waived this defense and may not now assert it.

### *Excessive Damages*

Westlake argues that the compensatory damages awarded by the jury were excessive and that the district court erred by declining to either reduce the award or grant a new trial.  Aplt. App. vol. III, at 664.  They ask for remittitur to $100,000.  The district court denied this motion because it concluded that "there

25

was substantial evidence in the record to support the jury's award." Id. at 665–66. We agree.

When state substantive law governs a claim for relief, state law also provides the appropriate standard for a district court's decision as to whether the verdict was excessive. Hill, 815 F.3d at 667 (quoting Gasperini, 518 U.S. at 419). Oklahoma law provides:

> The general rule is that the issue of damages in a personal injury action is left to the jury after hearing all the evidence. A verdict of a jury cannot be set aside as excessive unless it strikes mankind, at first blush, as beyond all measure unreasonable and outrageous and such as manifestly shows it was actuated by passion, prejudice, partiality or corruption.

Strubhart v. Perry Mem'l Hosp. Trust Auth., 1995 OK 10, ¶ 18, 903 P.2d 263, 270 (Okla. 1995). To determine whether a damage award is excessive, an appellate court must look at the evidence and must view the evidence in the light most favorable to the plaintiffs. Currens v. Hampton, 1997 OK 58, ¶ 10, 939 P.2d 1138, 1141 (Okla. 1997). Further, "Oklahoma recognizes a broad jury discretion to determine the amount of damages for intangible injuries such as damage to reputation, humiliation, etc." Brown v. Skaggs-Albertson's Props., Inc., 563 F.2d 983, 988 (10th Cir. 1977) (citing Park v. Sec. Bank & Trust Co., 1973 OK 72, 512 P.2d 113 (Okla. 1973)).

After carefully considering the entire trial record and viewing the evidence in the light most favorable to plaintiffs, we are convinced that the damages

26

awarded were not excessive. Based on the evidence presented at trial, the jury could reasonably have concluded that Mrs. Mayberry was abused on a daily basis from the time she moved into the facility in 2008, until the day her family revealed the video tape of the abuse to the facility, April 16, 2012. The jury also could have found that the abuse caused emotional distress that was significant enough to have contributed to Mrs. Mayberry's death. An award of $1.2 million is not "beyond all measure unreasonable and outrageous" as compensation for three and a half years of daily torment. The district court did not abuse its discretion for so finding.

### *Improper Closing Argument*

Westlake argues that the district court erred by allowing counsel for plaintiffs to make arguments that "invited an award based on consideration of *deterrent and punitive* rather than compensatory factors." Aplt. Br. at 40 (emphasis in original). Westlake moved for a new trial on this basis. The district court denied the motion. Although we agree that portions of the argument were improper at the time they were presented, Westlake has failed to show that the argument led the jury to return a verdict based on passion or prejudice rather than the evidence presented at trial.

Whether a trial court provided an adequate remedy for an improper closing argument is a procedural issue controlled by federal law. Lambert, 671 F.2d at 375. Courts must ensure "that every litigation be fairly and impartially conducted

27

and that verdicts of juries be rendered only on the issues made by the pleadings and the evidence." N.Y. Cent. R.R. v. Johnson, 279 U.S. 310, 318 (1929). Litigants are entitled "to a verdict uninfluenced by the appeals of counsel to passion or prejudice." Id.; see also Minshall v. McGraw Hill Broad. Co., 323 F.3d 1273, 1285 (10th Cir. 2003). But courts must exercise "great caution" in setting aside a jury's verdict due to an improper argument. Lambert, 671 F.2d at 375. Even if some statements exceeded the bounds of permissible argument, "a judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict." Id.

We must be "mindful that '[t]he trial judge is in the best position to determine' the prejudicial effect of improper arguments, and thus whether a new trial is warranted." Whittenburg, 561 F.3d at 1127 (quoting Ketchum v. Nall, 425 F.2d 242, 244 (10th Cir. 1970)). "[C]losing remarks often occupy only a fraction of what the jurors hear" and "[r]equiring a new trial is . . . a serious and costly remedy for all involved." Id. at 1127–28. "Because the presiding trial judge is present in the courtroom throughout the proceedings, he or she is uniquely positioned to assess the prejudicial effect of an improper argument in the context of the overall trial, as well as to fashion an appropriately tailored remedy." Id. at 1128. Thus, the district court's decision "will not be disturbed absent a clear abuse of discretion." Id. at 1127.

We recognize the potential prejudice posed by arguments that invite the jury to award damages based on punishment or deterrence when only compensatory damages are at issue. See Spulak v. K Mart Corp., 894 F.2d 1150, 1155–56 (10th Cir. 1990); Caudle v. District of Columbia, 707 F.3d 354, 361 (D.C. Cir. 2013). But such arguments are appropriate when the law and the evidence place the issue of punitive damages before the jury. See Ramsey v. Culpepper, 738 F.2d 1092, 1100 (10th Cir. 1984); Vanskike v. ACF Indus., Inc., 665 F.2d 188, 209–210 (8th Cir. 1981). In this case, it is undisputed that punitive damages were available as a remedy. The claimed error is based only upon the timing of the closing argument.

Oklahoma substantive law provides for punitive damages as a remedy and delineates a two-stage process for the award of any such damages.[6] Okla. Stat. tit 23, § 9.1; Lierly v. Tidewater Petroleum Corp., 2006 OK 47, ¶ 31, 139 P.3d 897, 906 (Okla. 2006); see also Bannister v. State Farm Mut. Auto. Ins. Co., 692 F.3d 1117, 1124 n.9 (10th Cir. 2012) (acknowledging bifurcated procedure requirement in the statute). In the first stage, the jury must determine questions of liability, the amount of actual damages, and whether the defendant acted with reckless disregard for the rights of others. Lierly, 2006 OK 47, ¶ 31, 139 P.3d at 906. In

---

[6] We note that, under Erie and Shady Grove, this procedure may or may not be binding on federal courts. Rather than address this complex question, we assume, without deciding, that the district court should have followed Oklahoma's bifurcated procedure.

29

the second stage, the jury determines the amount of punitive damages that will appropriately "punish the reckless and malicious behavior and deter such behavior in the future." Id., ¶¶ 31–32, 139 P.3d at 906. Although "evidence which relates solely to the amount of punitive damages should not be admitted until the second stage," id., ¶ 32 n.11, 139 P.3d at 906, a trial court errs as a matter of law if it precludes the arguments entirely, id., ¶ 34, 139 P.3d at 907. The parties have a "statutory right to present argument on the fact question as to the amount of punitive damages," so this argument must be allowed during the second stage of trial. Id. Thus, because Oklahoma law allows for punitive damages in this case and, further, requires that plaintiffs be allowed to argue the factual basis for the award of punitive damages, the contested arguments were not improper. It is only their timing that was in error.

Not all errors require reversal. In this case, the district court concluded that "the statements of counsel referenced by Westlake defendants in their motion did not have such a prejudicial effect to warrant a new trial" because "counsel's statements would not have led the jury to base its actual damages award on deterrent and/or punitive purposes." Aplt. App. at 666. We agree. The jury was properly presented with instructions on the availability of punitive damages, including the procedure for the two-step process. Westlake has failed to show that counsel's argument, although ill-timed, impermissibly invited the jury to award punitive damages during the first phase rather than the second.

30

In prior cases, this court has considered three factors when assessing the prejudicial effect of an improper closing argument: whether the improper comments were "'minor aberrations' made in passing," whether the district court took "any specific curative action," and whether the jury's findings, "while not beyond the bounds of rationality, suggest that counsel's comments had a prejudicial effect." Whittenburg, 561 F.3d at 1131–32. In this case, all three factors indicate that the jury was not prejudiced by the improper argument.

First, the improper statements were "minor aberrations made in passing," not "the heart and soul" of the argument. See Whittenburg, 561 F.3d at 1131. The challenged argument is the one plaintiffs' counsel delivered in rebuttal closing during the first stage of trial. Prior to this argument, plaintiffs' counsel presented an argument that reviewed the evidence presented in the trial. Aplt. App. vol. IV, at 1116–18. This argument included discussion of the employment records of both Gakunga and Kaseke, their repeated reprimands for sleeping on the job, abandoning shifts early, and refusing to complete assigned patient care tasks, and reviewed the testimony of the nursing students who witnessed abuse perpetrated by these two caretakers. Id. Counsel also discussed the nursing home's decision to retain these caretakers in spite of the indications that patients were being harmed while in their care. Id. Counsel concluded this first argument by asking the jury to "consider what it will take to fairly and fully compensate Mrs. Mayberry's estate for the abuse that she suffered at the hands of this nursing

31

home" and then again played for the jury the video recordings that showed nursing home employees abusing Mrs. Mayberry. Id. After Westlake's closing argument, plaintiffs' counsel delivered the rebuttal argument that is now challenged. In this argument, counsel told the jury: "You can change the way that nursing homes train their employees. You can make nursing homes understand that it is vital to protect their residents from abuse." Id. at 1134–37. Because it referred to all nursing homes, not just Quail Creek, this argument was ill-timed. It should have been presented during the second stage of trial, not the first. However, counsel went on to argue that Quail Creek was liable because it did not protect its residents from abuse by failing to properly train employees to recognize and prevent abuse, and by failing to enforce policies and procedures that would have protected Mrs. Mayberry. Id. Counsel then explicitly referred to the multi-stage process required for awarding punitive damages. He argued:

> The first step here is to render a verdict against this nursing home. Render a verdict against this nursing home for the abuse that Ms. Mayberry suffered at the hands of their employees. Included in your verdict, you are going to have to place a value on what happened to Ms. Mayberry. It must be fair, it must fully compensate Ms. Mayberry's estate for the physical pain and the mental suffering that she endured. You must place a value on that pain, that humiliation, and the mental scarring that occurred to Ms. Mayberry.

Id. In this portion of the argument, counsel asked for nothing more than full compensation for Mrs. Mayberry's injuries and, in so doing, reminded the jury that, at step one, only compensatory damages were at issue. Counsel then

32

addressed each of the other two questions presented to the jury during stage one,

and argued that the jury should find both that Quail Creek "recklessly disregarded

the rights of Mrs. Mayberry" and that Quail Creek "intentionally and with malice

abused Mrs. Mayberry." Id. Counsel then concluded his argument. See id.

Although this argument included remarks that asked the jury to award punitive

damages, counsel did not ask the jury to do so during the first stage of trial rather

than the second. In fact, counsel explicitly reminded jurors that step one was to

compensate Mrs. Mayberry for her pain and suffering at the hands of the nursing

home employees. When considered as a whole, the argument would not have led

a reasonable juror to award punitive damages during the first phase of trial rather

than waiting until the second phase, as they had been instructed to do. The errant

remarks about sending a message to all nursing homes cannot be viewed as

prejudicial in these circumstances.

Second, although the district court overruled Westlake's objection to the

argument,[7] it adequately instructed the jury regarding when and how punitive

_____

[7] We do not discount the fact that a trial judge's failure to sustain an objection to a line of argument is likely to give the jury the impression that it may properly consider the argument. See N.Y. Cent. R.R., 279 U.S. at 318. In this case, however, the argument for punitive damages should have been considered by the jury. The only error here was the timing of the argument. Thus, the only question for this court is whether the judge's implicit approval of the argument would have confused the jury as to *when* it could award punitive damages, not if. In light of the other instructions given regarding the sequential trial procedures for the award of compensatory and punitive damages, we think the judge's

(continued...)

damages could be awarded. See Whittenburg, 561 F.3d at 1131. Before the first stage of deliberations, the jury was instructed as to both compensatory and punitive damages. With regard to compensatory damages, the jury was instructed that "[t]he damages you award must be fair compensation, no more and no less," that "[i]n fixing the amount of compensatory damages, you may consider the following elements of injury and harm: (1) Mrs. Mayberry's physical pain and suffering, if any, and (2) Mrs. Mayberry's emotional and mental anguish, if any," and that "you should be guided by dispassionate common sense. You must use sound discretion in fixing an award of damages, drawing reasonable inferences from the facts and evidence. You may not award damages based on sympathy, speculation, or guess work." Aplt. App. vol. II, at 466. This instruction clearly explained to the jury the task presented. Further, with regard to punitive damages, the jury was instructed that "[i]f you find in favor of plaintiffs, and grant them actual damages, then you must also find by a separate verdict, whether the defendant acted in reckless disregard of the rights of others and/or acted intentionally and with malice towards others." Id. at 467. This is an accurate representation of the findings the jury must make at stage one. Finally, the jury was instructed that "[i]f you find that the defendant acted in reckless disregard of the rights of others, or intentionally and with malice towards others, you may

---

[7](...continued)
implicit approval of the argument did not confuse the jury.

34

award punitive damages against the defendant *in a later part of this trial*." Id. (emphasis added). Here the court again reminded jurors that punitive damages, although they might be awarded in phase two, were not to be awarded in phase one. In addition, the verdict form provided to the jury in stage one asked the jury to complete the following sentence, "We find the dollar amount of damages *sustained by Plaintiffs* is the sum of $_____." Id. at 475–76 (emphasis added). By correctly asking the jury only for the full amount of compensatory damages, this form again reminded jurors that only compensatory damages were at issue in stage one of the trial. In light of the clear instructions explicitly delineating the questions before the jury in each stage of the proceedings, and the verdict form asking for only compensatory damages, we cannot say that the errant remarks during closing argument would have lead the jury to award punitive damages during the first stage rather than the second.

Third, the respective amounts awarded for compensatory damages and punitive damages do not suggest that the improper argument had a prejudicial effect. See Whittenburg, 561 F.3d at 1132. At stage one, the jury awarded $1.2 million in compensatory damages. As discussed above, the jury could have found that Mrs. Mayberry was abused on a daily basis for a period of approximately three and a half years. Given the wide discretion afforded to juries to fix the amount of noneconomic compensatory damages, the evidence might also have supported a much larger verdict at stage one. Thus, the size of this verdict does

35

not indicate that the jury awarded anything more than full compensatory damages at stage one. At stage two, the jury awarded an additional $10,000 in punitive damages. Again, the evidence presented at trial might have supported a much larger amount. The jury reasonably could have found that the nursing home failed to supervise and train employees, failed to report incidents to the appropriate state agency, and failed to take action against the employees who perpetrated reported incidents of abuse on more than one occasion. In fact, the jury did find, at stage one, that the nursing home displayed reckless disregard for the rights of others. The relatively small punitive damage award is explained by the additional evidence presented to the jury at stage two of the trial. Pursuant to Oklahoma law, the jury was instructed to consider, among other factors, the financial condition of the defendant. See Okla. Stat. tit. 23, § 9.1(A)(7); Aplt. App. vol. II, at 473–74. The parties had stipulated that the fair market value of Westlake Nursing Home Limited Partnership was $2,855,786.50. Aplt. App. vol. V, at 1144. The jury was instructed that "the purpose of punitive damages is to punish and not destroy a defendant." Aplt. App. vol. II, at 473. In closing argument at the second stage, defense counsel argued that the compensatory damages award of $1.2 million had already come close to destroying the nursing home and that award itself was a severe punishment already. He asked the jury to award no additional damages at stage two. The fair market value of Westlake provides a plausible explanation for why the jury did not award more in punitive

36

damages at stage two. In addition, if the jury had been confused and awarded punitive damages in stage one, we would expect it to award nothing further at stage two, having already included punitive damages in its compensatory damages award. But instead, the jury awarded an additional $10,000 to plaintiffs. This award is eminently reasonable in light of Westlake's egregious conduct and poor financial condition.

Taken together, these three factors indicate that the jury was not prejudiced by the poorly timed statements regarding the award of punitive damages. The jury was clearly instructed as to the correct procedure, and the size of the awards, when considered in the context of the evidence presented at trial, including the evidence regarding Westlake's financial condition, gives us little reason to conclude that the procedure was not followed. A new trial is not warranted in these circumstances.

### *Evidence of Other Incidents*

Westlake argues that the district court erred by admitting evidence of another incident subject to a limiting instruction. Prior to trial, Westlake filed a motion in limine to exclude "any evidence regarding the allegation that Caroline Kaseke sprayed a resident in the face with a shower head or caused any other physical or mental harm to any residents at the Quail Creek Nursing and Rehabilitation Center (the 'Nursing Home') on or about April 4, 2012 (the 'April 4th Incident')." Aplt. App. vol. I, at 190–91. The district court denied

Westlake's motion because "this evidence would be relevant, not unfairly prejudicial, and, therefore, admissible if the abuse at issue in this case occurred after the April 4, 2012 incident." Aplt. App. vol. II, at 429. Westlake objected again when the evidence was admitted at trial and the district court overruled the objection, finding that the time line remained in dispute. Aplt. App. vol. III, at 774–75. The evidence was admitted with the following limiting instruction:

> "You have heard evidence of other alleged incidents at the nursing home. The evidence is disputed as to when the alleged abuse of Ms. Mayberry at issue in this case occurred. You may consider evidence of another alleged incident only if you find that the other alleged incident occurred prior to the alleged abuse of Ms. Mayberry. If you find that another alleged incident occurred after the alleged abuse of Ms. Mayberry, you can not consider this alleged incident when deliberating and reaching your verdict in this case.

Aplt. App. vol. II, at 452.

We agree with the district court that this evidence is admissible to show notice if the incident took place before the abuse of Mrs. Mayberry, but not if it took place after. See Julander v. Ford Motor Co., 488 F.2d 839, 846 (10th Cir. 1973) ("Generally, where negligence is in issue, *prior* complaints to a defendant concerning an allegedly hazardous condition are admitted as being probative of the defendant's knowledge." (emphasis in original)). Westlake claims, however, that the undisputed evidence established that the abuse to Mrs. Mayberry occurred no later than February 11, 2012, in which case the April 4, 2012 incident could not have provided notice to defendants and is not relevant. Aplt. App. vol. I, at

38

193; Aplt. Br. at 47–49. They further argue that any "probative value was substantially outweighed by the evidence's unfair prejudice, confusion of the issues, and potential to mislead the jury." Id. at 49. We disagree.

First, the timing of the recording is disputed. Plaintiffs presented testimony that the length of time between when the video was recorded and when they presented it to the nursing home was less than ten days, which, if true, means it was recorded on or after April 6, 2012. Aplt. App. vol. III, at 723–24. Defendants attempted to present a handwritten note from Robyn Crandall, see Aplt. App. vol. V, at 1157–64, which, they argue, established that the video was recorded before February 11, 2012. No witness was able to testify as to the accuracy of this note. Witnesses for plaintiffs testified that they had never seen it before and that the information it contained was incorrect. Aplt. App. vol. III, at 723–24. Further, the language of the note itself is unclear and indicates uncertainty as to the dates. See Aplt. App. vol. V, at 1157–64. Most importantly, defendants failed to call Robyn Crandall as a witness, so the only evidence before the jury was that no witness could verify the information in the note—instead all witnesses denied its accuracy. See id. at 1122–23. Thus, there is a genuine issue as to the timing of the recording and the district court judge was correct to admit the evidence with the limiting instruction.

Second, even if the time line were clearly established, as defendants claim, the timing of the recording is entirely irrelevant to the evidentiary ruling at issue.

The limiting instruction properly allowed the jury to consider the incidents if they took place before the alleged *abuse* of Mrs. Mayberry, not necessarily before the specific acts caught on video tape occurred. Even if it were undisputed that the abuse was recorded on video before April 4, 2012, there would still be a question of fact as to whether the abuse of Mrs. Mayberry was ongoing between April 4, 2012, and April 16, 2012, when the abusers were arrested. As discussed above, the evidence presented at trial would support a jury finding that it was.

Third, the evidence of other incidents is certainly unfavorable to Westlake, but nothing indicates that this prejudice is in any way unfair. See United States v. Archuleta, 737 F.3d 1287, 1293 (10th Cir. 2013) ("[U]nfair prejudice must do more than simply harm a defendant's case."). Therefore, we affirm the district court's decision to allow evidence of the April 4th Incident with the accompanying limiting instruction.

**III**

We affirm the district court's denial of Westlake's motion to alter or amend the judgment, as well as Westlake's motion for remittitur or alternatively for a new trial. The district court did not err by declining to reduce the compensatory damage award to the statutory cap of $350,000, or to reduce the compensatory damage award as excessive. We conclude that the error in allowing closing argument regarding punitive damages at stage one instead of stage two did not compromise the jury verdict in this case. Finally, the district court did not err in

40

admitting evidence of other alleged incidents at Quail Creek subject to a limiting instruction.  The judgment of the district court is affirmed.