**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BRENDA MCCRACKEN; CHRISTA
HECHT, individually and on behalf of all
others similarly situated,

     Plaintiffs - Appellants,

v.

PROGRESSIVE DIRECT INSURANCE
COMPANY; PROGRESSIVE
PREFERRED INSURANCE COMPANY,

     Defendants - Appellees.

_____

JERRY ARCHULETA, individually and
on behalf of all others similarly situated,

     Plaintiff - Appellant,

v.

USAA CASUALTY INSURANCE
COMPANY; UNITED SERVICES
AUTOMOBILE ASSOCIATION,

     Defendants - Appellees.

_____

No. 17-1285

No. 17-1286

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CV-00114-CMA-STV) and (D.C. No. 1:17-CV-00191-RBJ)**
_____

Nelson A. Waneka, of Levin Sitcoff PC, Denver, Colorado (Bradley A. Levin and Susan S. Minamizono, of Levin Sitcoff PC, Denver, Colorado, and Keith R. Scranton and Patricia A. Meester, of Franklin D. Azar and Associates, P.C., Aurora, Colorado, with him on the briefs), for Plaintiff-Appellants.

Casie D. Collignon (Sammantha J. Tillotson with her on the brief), of Baker & Hostetler LLP, Denver, Colorado, for Progressive Direct Insurance Company and Progressive Preferred Insurance Company, Defendants-Appellees.

Casie D. Collignon, of Baker & Hostetler LLP, Denver, Colorado (Michael Mulvaney, Thomas Butler, and Taryn Hodinka, of Maynard Cooper & Gale, Birmingham, Alabama, and Jon F. Sands and Marilyn S. Chappell, of Sweetbaum Sands Anderson PC, Denver, Colorado, with her on the brief), for USAA Casualty Insurance Company and United Services Automobile Association, Defendants-Appellees.

_____

Before **LUCERO**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

The plaintiffs in these consolidated appeals each settled a claim under their automobile-insurance policies with the defendants. But now the plaintiffs maintain that the defendants illegally reduced their settlement offers by taking into account certain benefits they had previously paid the plaintiffs. The district courts dismissed the plaintiffs' putative class-action lawsuits after concluding the plaintiffs each waived their rights to collect further damages from the defendants on their settled claims.

We reverse in part and remand to the district court with instructions to vacate its judgment in favor of USAA Casualty Insurance Company because it lacked jurisdiction to hear the claims against that defendant. Otherwise, we affirm.

2

**Background**

## I.      Legal Background

These cases involve the interplay between two categories of automobile insurance that insurers must offer under Colorado law: uninsured/underinsured-motorist (UM/UIM) coverage and medical payments (MedPay) coverage. *See* Colo. Rev. Stat. §§ 10-4-609(1)(a), 10-4-635(1)(a). UM/UIM coverage insures the policyholder for injuries caused by a third-party driver without sufficient insurance to cover the policyholder's injury. *See* Colo. Rev. Stat. § 10-4-609(1)(a), (4). MedPay coverage insures the policyholder for any bodily injury "resulting from the ownership, maintenance, or use of [a] motor vehicle," regardless of fault. § 10-4-635(1)(a).

In 2007, the Colorado legislature amended its insurance law to mandate that "the amount of the coverage available" under UM/UIM policies "shall not be reduced by a setoff from any other coverage, including" MedPay.[1] An Act Concerning the Payment of Uninsured Motor Vehicle Insurance as Excess to Other Insurance, § 1, 2007 Colo. Legis. Serv. 1921, 1921 (2007) (codified at § 10-4-609(1)(c)). This amendment initially caused some confusion. Focusing on the word "coverage" in § 10-4-609(1)(c), a number of Colorado courts held that the amendment only prohibited insurers from taking a setoff from a UM/UIM claim if the setoff would

---

[1] A setoff is "[a] debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor." *Setoff*, Black's Law Dictionary (10th ed. 2014). Thus, in this context, a setoff is an amount by which an insurer reduces a policyholder's claim to account for other benefits for which the policyholder must reimburse the insurer.

effectively reduce the amount of coverage available. *See, e.g.*, *Carrion-Kozak v. Alghamdi*, No. 13CV92, slip op. at 2 (Arapahoe Cty., Colo. Dist. Ct. Dec. 13, 2013) ("While [§ 10-4-609(1)(c)] prohibits a setoff which reduces coverage, it does not prohibit a setoff which merely adjusts the amount an insurer must pay to prevent a double recovery."); *Willyard v. Am. Family Mut. Ins. Co.*, No. 11CV931, slip op. at 4 (Boulder Cty., Colo. Dist. Ct. May 8, 2012) (upholding insurance contract that "allows for a setoff of the amount *paid*" in MedPay but "does not affect the coverage available under either the [MedPay] or the [UM/UIM] benefits policy"). In other words, these courts held that if a policyholder's UM/UIM claim exceeded the maximum amount of coverage available under the policy, then the insurer owed the maximum coverage amount without a setoff because taking a setoff in such a situation would effectively reduce the maximum amount of coverage available under the UM/UIM policy. *See Carrion-Kozak*, slip op. at 3; *Willyard*, slip op. at 4. But in cases in which the policyholder's claims were for amounts less than their coverage limits, these courts held that a setoff was proper to prevent double recovery. *See Carrion-Kozak*, slip op. at 3; *Willyard*, slip op. at 4. And because such claims don't meet or exceed the coverage limit, taking the setoff in such cases wouldn't have affected the coverage limit.[2] *Carrion-Kozak*, slip op. at 3; *Willyard*, slip op. at 4.

---

[2] One trial court offered the following illustration of this interpretation of § 10-4-609(1)(c):

> For example, if a driver has a liability policy that provides $5,000 in [MedPay] coverage and a separate UM/UIM policy that provides an additional $25,000 in medical coverage, the $25,000 in coverage cannot

But in November 2016, the Colorado Supreme Court issued an opinion that contravened this understanding. *See Calderon v. Am. Family Mut. Ins. Co.*, 383 P.3d 676 (Colo. 2016). The plaintiff in *Calderon* had an insurance policy with the defendant that included $300,000 in UM/UIM coverage and $5,000 in MedPay coverage. *Id.* at 677. After the plaintiff sustained injuries in a collision with an uninsured driver, the defendant paid the plaintiff's full $5,000 in MedPay benefits. *Id.* Yet the parties couldn't agree on how much the defendant owed the plaintiff in UM/UIM benefits. *Id.* A jury eventually awarded the plaintiff about $68,000. *Id.* Following the approach many courts took at the time, the trial court reduced the jury's award by $5,000 to set off the MedPay benefits the plaintiff had already received. *Id.*

The plaintiff appealed, and the Colorado Court of Appeals held that the setoff was proper under § 10-4-609(1)(c). *Id.* The Colorado Supreme Court granted certiorari and reversed. *Id.* It held that § 10-4-609(1)(c)'s prohibition on setoffs "refers not to the coverage limit but rather to the amount of UM/UIM coverage available on a particular claim." *Id.* Thus, under *Calderon*, the amount a policyholder

---

be reduced by the $5,000 policy. Thus, if the insured sustains $30,000 in medical expenses, the insured is entitled to full payment of the total amount because the insured has $30,000 in coverage ($5,000 + $25,000). Alternatively, if the insured sustains only $10,000 in expenses, she is not entitled to receive $5,000 from the first policy AND $10,000 from the second policy. Such an interpretation would result in an improper double recovery.

*Carrion-Kozak*, slip op. at 3.

5

may claim in UM/UIM benefits is unaffected by any MedPay benefits the policyholder previously received.

## II. Factual Background

The plaintiffs in the cases before us each settled a UM/UIM claim after § 10-4-609(1)(c)'s effective date but before the Colorado Supreme Court issued *Calderon*. The parties thus reached these settlements under the pre-*Calderon* understanding of § 10-4-609(1)(c).

### A. Archuleta's Claim and Settlement

Jerry Archuleta held an insurance policy from the United Services Automobile Association (USAA). The policy included $5,000 in MedPay coverage and $50,000 per person in UM/UIM coverage. Archuleta submitted claims to USAA for MedPay and UM/UIM benefits in November 2012 after an underinsured driver injured him in a collision. USAA paid Archuleta $5,000 to satisfy his MedPay claim. It then paid Archuleta $17,000 in May 2015 to settle his UM/UIM claim.

The parties agree that when USAA calculated this settlement, it took a $5,000 setoff to account for the MedPay benefits it had previously paid Archuleta. In other words, USAA determined that Archuleta incurred $22,000 in injuries and then reduced that amount by the $5,000 it had already paid, arriving at $17,000. Archuleta accepted the $17,000 settlement and signed a form "releas[ing][] and forever discharg[ing]" USAA "from any and all claims" he had arising from the November 2012 collision. App. 679.

6

**B. Hecht's Claim and Settlement**

Christa Hecht held an auto insurance policy from Progressive Preferred Insurance Company. Hecht's policy included $5,000 in MedPay coverage and $25,000 per person in UM/UIM coverage. Hecht submitted MedPay and UM/UIM claims in August 2013 after an uninsured driver injured her in a collision. Progressive Preferred fulfilled Hecht's MedPay claim and then reached an agreement with her to settle her UM/UIM claim for $21,678. The parties agree that when Progressive Preferred calculated this settlement, it took a setoff to reflect the MedPay benefits it had previously paid Hecht.[3] Hecht also signed a form acknowledging that the payment was "in full settlement and final discharge of all claims" arising from the August 2013 collision. App. 143.

**C. McCracken's Claim and Settlement**

Brenda McCracken held an insurance policy from Progressive Direct Insurance Company. McCracken's policy included $10,000 in MedPay coverage and $50,000 in UM/UIM coverage. McCracken submitted claims to Progressive Direct for MedPay and UM/UIM benefits in August 2015 after an uninsured driver injured her in a collision. Progressive Direct fulfilled McCracken's MedPay claims and initially paid her $30,959 for her UM/UIM claim. In September 2016, McCracken and Progressive Direct agreed to settle her final UM/UIM claim for a total of

---

[3] The record doesn't reflect how much Progressive Preferred paid Hecht in MedPay benefits.

7

$41,000; Progressive Direct paid McCracken an additional $10,041 to satisfy this settlement.

The parties agree that the settlement incorporates a $5,000 setoff Progressive Direct took to reflect the MedPay benefits it previously paid to McCracken.[4] Upon receiving the final payment from Progressive Direct, McCracken signed a form entitled "Full Release and Trust Agreement" in which she acknowledged receiving $41,000 "in full settlement and final discharge of a disputed claim" arising out of the August 2015 collision. App. 128.

## III.   Proceedings Below

### A.     *Archuleta v. USAA*

Archuleta sued USAA and USAA Casualty in Colorado state court on November 11, 2016—four days after the Colorado Supreme Court decided *Calderon*. Archuleta alleged that USAA violated § 10-4-609(1)(c) by taking the MedPay setoff into account when it calculated his UM/UIM settlement. He asked the court for damages for breach of contract and a declaratory judgment that averred USAA wrongly denied him UM/UIM benefits. He further purported to represent a class of similarly situated plaintiffs who also settled UM/UIM claims with USAA or USAA Casualty for amounts that took into account setoffs for prior MedPay benefits.

---

[4] The record doesn't reflect how much Progressive Direct paid McCracken in MedPay benefits.

8

The insurers removed Archuleta's lawsuit to federal district court.[5] They then moved for judgment on the pleadings, arguing that Archuleta released his right to collect further damages when he accepted the $17,000 settlement for his UM/UIM claim. Archuleta acknowledged he signed a release but argued that, in the wake of *Calderon*, the release was unenforceable as a violation of public policy. The district court enforced the release and ruled for the insurers. Archuleta appeals.

### B.    *McCracken & Hecht v. Progressive*

About a week after Archuleta filed his lawsuit, McCracken and Hecht jointly sued Progressive Direct and Progressive Preferred in Colorado state court. Like Archuleta, McCracken and Hecht alleged that the insurers violated § 10-4-609(1)(c) by taking into account MedPay setoffs when calculating their settlements. McCracken and Hecht also sought damages for breach of contract, requested a declaratory judgment that averred the insurers wrongfully withheld UM/UIM benefits

---

[5] USAA and USAA Casualty asserted the Class Action Fairness Act of 2005 (CAFA) as the basis for the district court's jurisdiction. *See* 28 U.S.C. § 1332(d). Under the CAFA, federal district courts may exercise jurisdiction—with some exceptions—over state-law disputes if the matter in controversy exceeds $5 million, at least one class member is a citizen of a different state than at least one defendant, and the class includes at least 100 members. *See id.*; *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 552 (2014). To remove a putative class action to federal court, "a defendant's notice of removal need include only a plausible allegation" that these requirements are satisfied. *Owens*, 135 S. Ct. at 554. In their notice of removal, USAA and USAA Casualty asserted that, by their calculations, they had taken more than $8 million in MedPay setoffs from more than 1,000 UM/UIM claimants. They further asserted that they were both citizens of Texas while Archuleta was a citizen of Colorado.

9

from them, and purported to represent a class of plaintiffs with similar claims against Progressive Direct and Progressive Preferred.

The insurers removed McCracken and Hecht's lawsuit to federal district court.[6] McCracken and Hecht moved for partial summary judgment on (1) whether *Calderon* applied retroactively, (2) whether their releases were unenforceable as a matter of public policy, and (3) whether the district court was required to reform their insurance contracts. The insurers responded with a cross-motion for full summary judgment on the theory that the releases McCracken and Hecht each signed precluded their claims and, alternatively, that *Calderon* didn't apply retroactively. After hearing arguments, the district court ruled from the bench that the releases were enforceable and granted summary judgment to the insurers.

McCracken and Hecht appealed, and we consolidated their appeal with Archuleta's appeal for the purpose of briefing.

## Analysis

### I. Archuleta's Standing to Sue USAA Casualty

As a preliminary matter, we sua sponte correct a jurisdictional error in the judgment in Archuleta's case below. *See City of Colo. Springs v. Climax Molybdenum Co.*, 587 F.3d 1071, 1078–79 (10th Cir. 2009) (explaining that we "are

---

[6] Progressive Direct and Progressive Preferred asserted in their notice of removal that, by their calculations, they took almost $7 million in MedPay setoffs from more than 1,000 UM/UIM claimants. They further asserted that they were both citizens of Ohio while McCracken was a citizen of Colorado and Hecht was a citizen of New Jersey.

10

under an independent obligation to examine [our] own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines'" (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990))).

The district court ruled that Archuleta lacked standing to sue USAA Casualty because his "personal allegations concern only USAA," not USAA Casualty. App. 771. Archuleta doesn't challenge this conclusion on appeal, so we won't revisit it either. *See Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012) (explaining that the plaintiff bears burden of establishing standing). But in light of this conclusion, we hold that the district court erred by dismissing Archuleta's claims against USAA Casualty with prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice."). Accordingly, we remand to the district court with instructions to vacate its judgment on Archuleta's claims against USAA Casualty and dismiss these claims without prejudice.

## II.     Merits Against the Remaining Defendants

We review both of the orders below de novo. *See Hall v. Conoco, Inc.*, 886 F.3d 1308, 1316 (10th Cir. 2018) (reviewing order granting summary judgment de novo); *Sanchez v. U.S. Dep't of Energy*, 870 F.3d 1185, 1199 (10th Cir. 2017) (reviewing judgment on pleadings de novo). We will affirm the district court's judgment on the pleadings for USAA if we agree that Archuleta fails to "allege 'a claim to relief that is plausible on its face.'" *Sanchez*, 870 F.3d at 1199 (quoting

11

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). We will affirm the district court's summary-judgment order for Progressive Direct and Progressive Preferred "if, viewing the evidence in the light most favorable to" McCracken and Hecht, "there is no genuine dispute as to any material fact" and Progressive Direct and Progressive Preferred are "entitled to judgment as a matter of law." *Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013).

## A.    The Releases

The plaintiffs do not dispute that they each signed a release waiving further claims against the defendants. Nor do they dispute that their present lawsuits fall within the scope of those releases or that, if the releases are enforceable, they bar the plaintiffs' claims. Thus, the purely legal question before us is whether those releases are enforceable under Colorado law. *See Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017) (explaining that we must look to substantive state law when hearing cases under our diversity jurisdiction).

"A release is the relinquishment of a claim to the party against whom such claim was enforceable." *CMCB Enters., Inc. v. Ferguson*, 114 P.3d 90, 96 (Colo. App. 2005). "Once a claim is released, the release bars the injured party from seeking further recovery." *Id.* When questions about a release's scope or enforceability arise, Colorado courts answer them with "general contractual rules of interpretation and construction." *Bunnett v. Smallwood*, 793 P.2d 157, 159 (Colo. 1990). Accordingly, they interpret releases "so as to effectuate the manifest intention of the parties." *Neves v. Potter*, 769 P.2d 1047, 1053 (Colo. 1989); *see also USAA Prop. & Cas. Co.*

12

*v. Brady*, 867 P.2d 203, 205 (Colo. App. 1993) (enforcing release in insurance settlement).

The plaintiffs argue the releases violate Colorado public policy and are therefore void. "Colorado courts will not enforce a contract that violates public policy." *Rademacher v. Becker*, 374 P.3d 499, 500 (Colo. App. 2015). "This rule does not exist for the benefit of the party seeking to avoid contractual obligations, but instead serves to protect the public from contracts that are detrimental to the public good." *Id.* To void a contractual provision for violating public policy, "the interest in enforcing the provision [must be] clearly outweighed by a contrary public policy." *FDIC v. Am. Cas. Co. of Reading, Pa.*, 843 P.2d 1285, 1290 (Colo. 1992).

The plaintiffs assert that § 10-4-609(1)(c) and *Calderon* signal Colorado's strong public policy for ensuring that UM/UIM policyholders are fully compensated for their claims.[7] Thus, they maintain, their releases are void for violating public policy because the releases prevent them from receiving all the UM/UIM benefits they're entitled to—that is, what they would've received without the MedPay setoffs. But after the close of briefing and oral argument in this case, the Colorado Court of Appeals held that the policy interests behind § 10-4-609(1)(c) and *Calderon* do not override the interest in enforcing a release signed pursuant to a negotiated settlement.

---

[7] The parties focus much of their briefing on the question of whether *Calderon* applies retroactively to the plaintiffs' settlements and thus bears on the releases' enforceability at all. But because we ultimately conclude that the releases bar the plaintiffs' claims even taking *Calderon* into account, we don't consider whether *Calderon* is retroactively applicable.

13

*See Arline v. Am. Family Mut. Ins. Co.*, 2018 WL 2436839 (Colo. App. 2018). For the reasons explained below, we follow *Arline* and reject the plaintiffs' argument.

**B.**    *Arline*

In *Arline*, the Colorado Court of Appeals resolved an issue that was identical in all relevant respects to the issue before us here: whether a pre-*Calderon* release that took a MedPay setoff into account and that the plaintiff signed pursuant to a UM/UIM settlement was enforceable in light of *Calderon*. *See id.* at *2. In resolving that question, the court first explained that the policy interests that drove the Colorado Supreme Court's reasoning in *Calderon* aren't implicated to the same extent when the parties enter a negotiated settlement to an insurance dispute. *See id.* at *3. That's because, the court said, "[t]he amount of damages resulting from an injury to an insured motorist is an issue of fact, to be negotiated by the parties *or* resolved by a fact finder." *Id.* (emphasis added). In *Calderon*, the trial court reduced the plaintiff's award below the amount of damages that the jury found the plaintiff incurred. *See id.* But in the case before it—as in the case before us—the plaintiff "negotiated her damages benefits and agreed that the $27,000 UIM benefit amount paid compensated her sufficiently to warrant releasing [the defendant] from any further claims." *Id.*

The *Arline* court then noted the countervailing policy interests in favor of encouraging the settlement of disputes. *See id.* And it explained that "[i]f releases and settlements could be 'lightly ignored,' insureds and insurers would be discouraged

14

from settling claims." *Id.* (quoting *Davis v. Flatiron Materials Co.*, 511 P.2d 28, 32 (Colo. 1973)). Lastly, the court concluded that nothing about § 10-4-609(1)(c) itself prevented parties from taking setoffs while settling insurance disputes. *See id.* Thus, it concluded that "the interest in enforcing the [release] . . . [was] neither clearly outweighed by a contrary public policy nor contrary to law" and accordingly enforced the release. *Id.* at 2.

Decisions of the Colorado Court of Appeals don't bind us. But we may only disregard them if we're "convinced by other persuasive data" that the Colorado Supreme Court would reach a different result. *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)); *see also West*, 311 U.S. at 237 ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law [that] is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

In determining whether the Colorado Supreme Court would reach a different result than the Colorado Court of Appeals reached in *Arline*, one potentially relevant data point is *Calderon*'s interpretation of § 10-4-609(1)(c). But although *Calderon* tees up the plaintiffs' argument, it doesn't resolve it. Instead, as the *Arline* court recognized, nothing in § 10-4-609 or *Calderon* addressed whether parties can agree to a setoff as part of a settlement over a disputed claim. *See Arline*, 2018 WL 2436839, at *3 (declining to extend *Calderon* "to a settlement and release agreement

15

entered into upon payment of insurance benefits in a negotiated amount"). *Calderon* simply held that, as a matter of statutory interpretation, § 10-4-609(1)(c) entitles UM/UIM claimants to UM/UIM benefits free of MedPay setoffs. *See* 383 P.3d at 677–79.

Thus, when *a court* calculates how much an insurer owes a policyholder in UM/UIM benefits, *that court* cannot take prior MedPay benefits into account. *See id.* at 677. And insurers cannot contract around § 10-4-609(1)(c) by writing setoff provisions into their insurance policies. *See id.* at 679–80. But it doesn't follow from these conclusions that once a UM/UIM policyholder has sustained an injury and thus has a vested claim to recover under the policy, the policyholder can't agree to take a setoff as part of a settlement for that claim. On the contrary, Colorado courts have consistently held that "[i]n general, statutory rights may be waived if the waiver is voluntary." *People ex rel. N.G.*, 303 P.3d 1207, 1218 (Colo. App. 2012); *see also, e.g.*, *First Interstate Bank of Denver, N.A. v. Cent. Bank & Tr. Co. of Denver*, 937 P.2d 855, 861 (Colo. App. 1996) ("In general, both substantive and procedural statutory rights may be waived so long as the waiver is voluntary."); *cf. Finney v. People*, 325 P.3d 1044, 1050 (Colo. 2017) (explaining that "[c]ounsel may waive a [criminal] defendant's statutory rights"). Thus, although *Calderon* held that the plaintiffs had a statutory right to collect their UM/UIM benefits without a setoff, whether they were free to waive that right when they settled their claims is a different matter. Therefore, *Calderon* doesn't contradict *Arline*.

16

The Colorado Supreme Court's decision in *Kral v. American Hardware Mutual Insurance Co.*, 784 P.2d 759 (Colo. 1989), presents another potential data point that warrants discussion. But nothing in *Kral* persuades us to stray from *Arline*. In *Kral*, the plaintiff submitted a UM/UIM claim to her insurer after an uninsured driver killed the plaintiff's husband in a collision. *See id.* at 760–61. The plaintiff and the insurer entered into what's known as a release-trust agreement, under which the insurer paid the plaintiff $30,000—the maximum amount of UM/UIM benefits under the contract. *Id.* at 761. But the plaintiff agreed to reimburse the insurer with 15% of any proceeds she recovered from her pending lawsuit against the uninsured driver. *Id.* After executing that agreement, the plaintiff amended her lawsuit against the driver to add a claim against the dram shop that served alcohol to the driver prior to the collision. *Id.* The plaintiff then settled that claim for $177,500, and the insurer subsequently demanded $26,635—15% of that settlement. *Id.*

The plaintiff sued for a declaratory judgment that averred the release-trust agreement was void for violating public policy. *Id.* The Colorado Supreme Court agreed that this provision was unenforceable to the extent it required the plaintiff to reimburse the insurer for damages she recovered from the dram shop. *Id.* at 765. It held "that agreements limiting insurers' liability for [UM/UIM] benefits [are] enforceable only to the extent such reduction in benefits would not impair the ability of the insured to achieve full compensation for any loss caused by the conduct of an uninsured motorist." *Id.* at 763. And because the plaintiff would have been able to recover from the bar *and* the driver if the driver had been insured, the release-trust

17

agreement prevented the plaintiff from achieving full compensation and was therefore void. *See id.* at 764.

The plaintiffs here argue *Kral* shows that the policy in favor of ensuring full compensation for UM/UIM claims is so strong that parties cannot contract around it, even when settling an existing claim that the parties have had a full and fair opportunity to valuate. We disagree. In distinguishing the facts before it in *Arline* from those before the Colorado Supreme Court in *Kral*, the Colorado Court of Appeals pointed out that the plaintiff in *Arline*—like the plaintiffs in this case and unlike the plaintiff in *Kral*—challenged the method the parties used to calculate their net settlement, not any actual term of the release. *Arline*, 2018 WL 2436839, at *4. *Id.* We have no reason to doubt that the Colorado Supreme Court would similarly distinguish the facts in *Kral* from those before us here.

Moreover, even if the parties here had explicitly agreed to the setoff in the terms of the releases, we're not convinced that *Kral* would render the releases void. As the Colorado Court of Appeals in *Arline* recognized, "*Kral* does not hold that insured parties are required to accept nothing less than full compensation for their losses." *Id.* Indeed, if *Kral* stands for the proposition that UM/UIM claimants can never settle for less than the full value of their claims, then insurers would rarely have an incentive to settle. We cannot conclude that Colorado's policy favoring full recovery of UM/UIM benefits is so strong that it warrants this result. *See Colo. Ins. Guar. Ass'n v. Harris*, 827 P.2d 1139, 1142 (Colo. 1992) (discussing public policy in favor of settling insurance disputes).

18

Rather, we read *Kral* as saying that parties to a UM/UIM dispute cannot include a provision in a settlement agreement that necessarily decreases the settlement below the bilaterally agreed upon value of the plaintiff's claim. The parties in *Kral* agreed that the full value of the plaintiff's UM/UIM claim was the full amount of the UM/UIM coverage—$30,000; thus, any amount the plaintiff subsequently reimbursed to the insurer would have reduced the plaintiff's benefits below the full value of the claim. *See* 784 P.2d at 761. But in the cases before us, the parties never agreed that the value of the plaintiffs' claims was anything higher than the amount they eventually accepted. And the settlement agreements contained nothing to further reduce the plaintiffs' recovery below the amount they agreed upon.

Put differently, the insurer's error in *Kral* was that it bilaterally agreed upon a settlement amount with the plaintiff and then attempted to reduce the plaintiff's benefits below that amount. Here, the insurers unilaterally took the MedPay setoffs into account when calculating their offers, but didn't attempt to further reduce the payments below the value that the plaintiffs accepted. *Kral* doesn't limit what parties can and cannot take into account when assessing the value of their claims. *See id.* at 763–65. Ultimately, therefore, the releases in this case didn't "impair the [plaintiffs'] ability" to settle for the full value of their losses. *Id.* at 763. Accordingly, we don't read *Kral* so broadly that it voids the plaintiffs' releases.

In sum, we're not "convinced by other persuasive data" that the Colorado Supreme Court would disagree with the Colorado Court of Appeals' decision in *Arline*. *Stickley*, 505 F.3d at 1077 (quoting *West*, 311 U.S. at 237). Thus, following

19

*Arline*—as we must—we agree with the district courts: the releases are enforceable and bar the plaintiffs' claims.

## Conclusion

We reverse the judgment in *Archuleta v. USAA* insofar as it dismissed Archuleta's claims against USAA Casualty with prejudice. As the district court ruled, Archuleta lacked standing to bring those claims. Accordingly, it did not have jurisdiction to hear them. We therefore remand to the district court with instructions to dismiss those claims without prejudice for lack of jurisdiction. Otherwise, we affirm the remainder of that judgment and affirm the judgment in *McCracken & Hecht v. Progressive* in its entirety.